No. 12-10250

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ANTHONY MAZZEO,

Plaintiff-Appellant,

v.

COLOR RESOLUTIONS INTERNATIONAL, LLC,

Defendant-Appellee.

On Appeal from the United States District Court
for the Middle District of Florida, Jacksonville Division
Hon. Roy B. Dalton, Jr., District Judge

BRIEF OF THE U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

P. DAVID LOPEZ
General Counsel

LORRAINE C. DAVIS
Acting Associate General Counsel

CAROLYN L. WHEELER
Assistant General Counsel

CHRISTINE J. BACK
Attorney

U.S. EQUAL EMPLOYMENT
    OPPORTUNITY COMMISSION
Office of General Counsel
131 M Street, N.E.
Room 5NW14G
Washington, D.C.  20507
(202) 663-4734 (phone)
(202) 663-7090 (fax)
christine.back@eeoc.gov

*No.: 12-10250, Mazzeo v. Color Resolutions Int'l, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

Back, Christine J., Attorney, EEOC

Color Resolutions Int'l, LLC, Defendant-Appellee

Dalton, Roy B., Jr., U.S. District Court Judge

Davis, Lorraine C., Acting Associate General Counsel, EEOC

Flynn, Chelsie J., Attorney for Defendant-Appellee, Ford & Harrison, LLP

Ford & Harrison LLP, Counsel for Defendant-Appellee

Law Office of David Sacks, PA, Counsel for Plaintiff-Appellant

Lopez, P. David, General Counsel, EEOC

Mazzeo, Anthony, Plaintiff-Appellant

Sacks, David B., Attorney for Plaintiff-Appellant

Walberg, Jessica T., Attorney for Defendant-Appellee, Ford & Harrison, LLP

Wheeler, Carolyn L., Assistant General Counsel, EEOC

Zandy, Aaron L., Attorney for Defendant-Appellee, Ford & Harrison, LLP

Pursuant to Eleventh Circuit Rules 26.1-1 and 29-2, the Commission submits the foregoing list of persons and entities known to have an interest in the outcome of this appeal.

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus Curiae the Equal Employment Opportunity Commission, as a government entity, is not required to file a corporate disclosure statement.

_____/s Christine Back_____
CHRISTINE J. BACK
Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

TABLE OF CITATIONS .................................................................................... iii

STATEMENT OF INTEREST .................................................................................1

STATEMENT OF ISSUES ...................................................................................2

STATEMENT OF THE CASE.................................................................................3

   A.  Statement of the Facts.....................................................................................3

   B.  District Court Opinion ...............................................................................10

ARGUMENT ........................................................................................................11

   I.   Mazzeo is disabled within the meaning of the amended ADA. ....................11

     A.  Mazzeo presented sufficient evidence to show he has a physical impairment that substantially limits the major life activity of lifting..............12

     B.  Mazzeo presented sufficient evidence to show he has a physical impairment that substantially limits his neurological function........................17

     C.  Mazzeo's back impairment was not transitory, as demonstrated by the same record evidence of Mazzeo's actual, physical impairment. ....................19

   II.  The district court erred in holding that Mazzeo's failure to formally apply for the vacancy precluded him from establishing a prima facie case of age discrimination. ......................................................................................................21

   III. Mazzeo presented evidence of discriminatory intent sufficient to establish a

prima facie case and show pretext as to both his ADA and ADEA claims. ........24

CONCLUSION ..................................................................................................31

CERTIFICATE OF COMPLIANCE......................................................................34

CERTIFICATE OF SERVICE ..............................................................................35

## TABLE OF CITATIONS

### CASES

*Benson v. Tocco, Inc.*, 113 F.3d 1203 (11th Cir. 1997)....................................26, 28

*Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984)...............22

*Carmona v. Southwest Airlines Co.*, 604 F.3d 848 (11th Cir. 2010).........12, 16, 17

*Chapman v. AI Transport, et.al.*, 229 F.3d 1012 (11th Cir. 2000) .........................24

*Cleveland v. Home Shopping Network*, 369 F.3d 1189 (11th Cir 2004)................12

*Combs v. Plantation Patterns*, 106 F.3d at 1527-1530 (11th Cir. 1997)................28

*Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir. 1986) ...............................31

*Durley v. APAC, Inc.*, 236 F.3d 651 (11th Cir. 2000) ............................................26

*Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322 (11th Cir. 1999).......29

*Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907 (11th Cir. 1996) .............14

*Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220 (11th

    Cir. 1999) .................................................................................................14, 24

*Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir.

    2006) .............................................................................................................30

*Jameson v. Arrow Co.*, 75 F.3d 1528 (11th Cir. 1996).........................................23

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001) ..........................29

*McCorstin v. United States Steel Corp.*, 621 F.2d 749 (5th Cir. 1980)..................29

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .....................................24

*McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068 (11th Cir.1996) .....................29

*Rossbach v. City of Miami*, 371 F.3d 1354 (11th Cir. 2004)...................................14

*Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342 (11th Cir. 2003)...........................22

*Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308 (11th Cir. 1998)...........22, 28

*Williams v. General Motors Corp.*, 656 F.2d 120 (5th Cir. 1981) .........................29

## STATUTES

29 U.S.C. §§ 621 et seq..........................................................................................1

42 U.S.C. § 12102(1)(A)........................................................................................13

42 U.S.C. § 12102(2)(A)........................................................................................13

42 U.S.C. § 12102(2)(B)...................................................................................13, 17

42 U.S.C. § 12102(3)(A)........................................................................................19

42 U.S.C. § 12102(3)(B)........................................................................................20

42 U.S.C. § 12102(4)(B)........................................................................................13

42 U.S.C. § 12102(4)(D)........................................................................................16

42 U.S.C. § 12102(4)(E)(i)(I-IV)...........................................................................16

42 U.S.C. § 12117...................................................................................................1

42 U.S.C. § 12206...................................................................................................1

*ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat.

3553 (2008) .............................................................................................1, 12, 13

## REGULATIONS

29 C.F.R. § 1630.2(l)(1)................................................................................19

29 C.F.R. § 1630.2(j)(1)(ii).........................................................................14

*29 C.F.R. § 1630.2(j)(1)(viii).....................................................................15

29 C.F.R. § 1630.2(j)(1)(v) ........................................................................14

29 C.F.R § 1630.2(j)(3)(ii) ..........................................................................18

29 C.F.R § 1630.2(j)(3)(iii)..........................................................................18

29 C.F.R. § 1630.2(j)(4)(ii).........................................................................14

29 C.F.R. § 1630.15(f) ...............................................................................20

29 C.F.R. Pt. 1630, App. § 1630.2(l) ..................................................19, 20

STATEMENT OF INTEREST

The U.S. Equal Employment Opportunity Commission ("EEOC") is charged by Congress with interpreting, administering, and enforcing various federal laws against employment discrimination, including Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12117, 12206, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq. This appeal presents important issues regarding the interpretation and application of several key terms within the ADA, as amended by the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553 (2008). These terms relate to the determination of disability: the means by which to assess whether a physical impairment "substantially limits" a major life activity, the analysis of a major bodily function as a major life activity, and the phrase "transitory and minor" in analyzing whether an employer perceived or regarded an employee as disabled.

This case also presents an opportunity for this Court to reiterate, consistent with its precedent, that a plaintiff's expression of interest in a specific vacancy to a direct supervisor, where the supervisor dissuades the employee from applying, is sufficient for the purpose of showing that the plaintiff "applied" for that position in an ADEA reduction in force (RIF) case. The Commission offers its views to the Court pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure.

1

## STATEMENT OF ISSUES[1]

I.    Whether the district court erred in concluding that Mazzeo failed to establish that he was disabled, where Mazzeo submitted an affidavit from his physician describing his medical diagnosis and symptoms, and presented evidence of lifting restrictions caused by his herniated disc and epidural steroid injections and medication he received for the pain.

II.   Assuming that this Court's RIF formulation of the prima facie test applies to Mazzeo's ADEA claim, whether the district court erred in requiring that he submit a formal application to show that he "applied," where Mazzeo orally expressed interest in a specific position and his direct supervisor communicated that he would not be considered.

III.  In light of increasing sales revenue in Mazzeo's territory, the company's hire of a young, inexperienced employee for a position substantially similar to Mazzeo's former position, and the company's inconsistent reasons for his termination, whether the district court erred in holding that Mazzeo presented insufficient evidence of discriminatory intent to survive summary judgment.

---

[1] The Commission expresses no opinion on any other issues presented in this appeal.

## STATEMENT OF THE CASE

A.    Statement of the Facts

Anthony Mazzeo began his employment at Color Resolutions International, LLC ("CRI"), an ink company, in 2004.  D24-1, P223.[2]  Furman Hixon Boyd, Vice President of CRI's Southern Region, was Mazzeo's direct supervisor from approximately 2006 to 2009.  D25-2, P320.  Throughout that time, Mazzeo held the same position — Technical Sales Representative (TSR) — and provided technical and sales service for CRI's Florida territory.  D25-2, P327, P329, P346, P348.   CRI employed a number of TSRs who covered different geographic territories.  D23-1, P123, ¶5.  In Boyd's Southern Region, there were seven other TSRs covering various parts of Texas, North and South Carolina, Virginia, Tennessee, Alabama, Georgia, Arkansas, Louisiana, Mississippi, Missouri, and Kansas.  *Id*.  Vivian Lumpkin, another TSR in Boyd's region, covered the territory of Chattanooga, Tennessee, Alabama, and Georgia.  *Id*.

As a TSR, Mazzeo was "expected to gather new business as well as provid[e] the technical support" for CRI clients in his territory.  D25-2, P343. Mazzeo made sales calls to potential clients at least once every two weeks to increase sales.  D25-2, P347; D24-1, P236.  As a result, he generated new clientele

---

[2] "D" refers to the document number and "P" refers to page number(s) in the consecutively paginated original record, pursuant to 11th Cir. R. 28-5 and Federal Rule of Appellate Procedure 28(e).

for CRI, including Consolidated Label, Palmas Printing, Brand Label, Cardinal Unijax, and Pratt Industries.  D24-1, P236-37.  Mazzeo also had years of experience in the ink business.  D25-2, P347.  Mazzeo was the third ranked TSR under Boyd's supervision.  D25-12, P401, P411.  On a rating scale of one to ten, with ratings of 7–8.9 signifying "commendable" performance, and 5-6.9 signifying "acceptable" performance, Mazzeo received ratings of 7.9 and 6.8 in his 2006 and 2007 performance evaluations, respectively.  D25-6, P372-75.

In 2008 and 2009, gross sales from Mazzeo's territory of Florida were greater than the gross sales from Alabama, Georgia, and Tennessee combined. D25-12, P412 (showing that sales for Alabama, Georgia, and Tennessee amounted to $1,229,653 in 2008, and $644,341 in 2009 while Florida alone showed a gain in gross sales from 2007 ($1,259,834) to 2008 ($1,427,102) to 2009 ($1,552,563)). George Sickinger, CRI's CEO, testified that 2008 "was a very good year," but that that fact was not "relevant to what was going on at the end of 2008 or what happened in 2009 and 2010."  D24-2, P276, P282.

Mazzeo has "degenerative disc disease, including a herniated disc at the L4-5 level of the lumbar spine" and a "moderate to large sized central disc herniation, which includes nerve root involvement, specifically the L5 nerve roots bilaterally." D25-16, P487, ¶¶4-5.  He first sought treatment in 2004, and when the pain worsened, he sought treatment again in 2007 when he was diagnosed with a

herniated disc.  D24-1, P243-46.  His condition stemming from "nerve root involvement" causes "pain radiating from the lumbar spine down Mr. Mazzeo's right leg," which increases with prolonged standing and sitting.  D25-16, P487-88, ¶¶6-7.  Mazzeo's condition affects "his ability to walk, run, bend, sleep and lift objects over ten (10) pounds."  *Id.* at ¶7.  In his doctor's view, these limitations are "substantial" and "permanent within a reasonable degree of medical certainty."  *Id.* at ¶8.

He experiences pain every day, but it varies in severity.  D24-1, P245.  Mazzeo has taken medication to manage the pain, including prescription medication such as Ultram, Voltaren and Skelaxin.  D24-1, P246; D25-16, P488, ¶10.  He also underwent a course of six lumbar epidural steroid injections.  D25-16, P488, ¶9.  After the injections, his physician recommended surgery.  *Id.*  After surgery, Mazzeo was placed under additional lifting restrictions for approximately three to five months.  D24-1, P265-66.  The 2009 surgery did not repair the herniated disc and his doctors told him he would likely need to undergo additional surgery.  *Id.* at 265.  Mazzeo still requires the use of a back brace to lift items, wearing it on an as needed basis between one to three hours at a time.  D24-1, P251-52.  His back condition affects his ability to perform certain physical activity whenever it "flares up."  D24-1, P245-46.

Mazzeo informed Boyd of his need for back surgery in late 2008 or January

2009.  D25-2, P320-21; D24-1, P249.  This was the first of several conversations
leading up to his termination on March 10, 2009.  D25-2, P320-21; D24-1, P249.
Mazzeo discussed his back problem with Boyd, and told Boyd that he was
exploring the possibility of back surgery at the Laser Spine Institute (LSI), was
going to be tested to determine which surgical procedure to undergo, and that his
surgery would result in his being "out of work for two weeks" and possible "light"
or "restricted" duty, meaning working within the additional lifting restrictions
following his surgery for approximately three to five months.  D24-1, P247, P249,
P265-66.  Mazzeo also told Boyd that he had received the results of an MRI test
that required the doctors to "put off my scheduling surgery for more tests."  D24-1,
P250.  When Mazzeo told Boyd that he expected to return to work shortly after his
surgery, Boyd told Mazzeo "he should really consider whether that was what the
doctor wanted him to do since his job required significant travel, four to six hours
in an automobile, and there was [sic] times when we have to lift buckets, that kind
of thing."  D25-2, P320-21.

On February 25, 2009, Mazzeo told Boyd that his surgery was scheduled for
March 11, 2009.  D24-1, P250.  On February 26, 2009, Boyd initiated the paper
work for Mazzeo's termination, which he scheduled for March 10, 2009.  D23-1,
P125, ¶9).  On March 10, 2009, Boyd met with Mazzeo in person, telling Mazzeo
that the reason for the meeting was to discuss his annual performance review.

D25-2, P344; D24-1, P235.  Instead, Boyd told him that he was being fired.  D24-1, P238.  The termination of Mazzeo's employment was in no way related to his job performance (D25-17, P499) and Boyd told Mazzeo that "it wasn't my performance; had nothing to do with that."  D24-1, P238.  Mazzeo was one of two TSRs fired nationwide and the only TSR fired from the Southern Region.  D23-1, P126, ¶10.  No other employees supervised by Boyd "had any known health conditions at the time" of Mazzeo's termination.  D25-12, P402, ¶7.

Meanwhile, in mid-2008, Lumpkin sought to retire and CRI began advertising for her replacement in late 2008.  D23-1, P126, ¶11.  Mazzeo became aware of her retirement at a sales meeting.  D24-1, P254.  In late January or early February 2009, Mazzeo spoke to Boyd in person and asked "if they had found anybody to take over for Vivian yet.  And he said, no.  And I asked him, I said, I would like to take over her territory and give it a go, and he said, no."  D24-1, P254.  Boyd told Mazzeo that he had "too much going on in Florida with new business coming on board that I needed to stay and concentrate on that."  D24-1, P255.

The merger of Mazzeo's former territory of Florida and Lumpkin's territory of Tennessee, Alabama, and Georgia, took place during the summer of 2009, though Boyd testified that the circumstances which led the company to merge the two existed while Mazzeo was still employed at CRI.  D25-2, P328.  When Boyd

was asked why he did not merge those territories and assign them to Mazzeo, he testified that Mazzeo had "expressed no interest in covering the territory," that "it had never occurred to me," and that Mazzeo "had a strong connection with Jacksonville." D25-2, P331. When asked later in his deposition "why Mr. Mazzeo was not considered to fill Ms. Lumpkin's territory," Boyd testified "I don't know." D25-2, P343. In his declaration, Boyd states he did not consider Mazzeo "because I had no reason to believe that Mr. Mazzeo would move to Atlanta." D23-1, P127, ¶16.

Jeremy Kyzer was hired for the same position that Mazzeo had occupied — a TSR. D25-2, P329; D25-14, P456. Typically, CRI does not extend verbal offers before an application is submitted and a test is administered. D25-2, P336. Boyd cannot recall whether he made his verbal offer of employment to Kyzer before or after Kyzer submitted an application. D25-2, P338. CRI, Boyd testified, is "not a very formal company." D25-2, P349. Though Kyzer first learned of a vacancy at CRI through an online posting, he did not apply or submit a resume online. D25-14, P453. Rather, Boyd first learned of Kyzer through a college professor who told Boyd that he had a student who had "done very well in school," but could not find a job. D25-2, P334. Boyd met with Kyzer in person, without Kyzer submitting an application beforehand. D25-14, P454. Afterwards, CRI called Kyzer "on the Monday before I began employment" for a second interview. *Id.* CRI then offered

8

Kyzer the job.  D25-14, P462.  Kyzer was 23 years old when Boyd hired him.
D23-1, P127, ¶15.

At the time of his hire, Kyzer had no sales experience and had just graduated
from college.  D25-14, P460; D25-2, P328.  Kyzer also had "very little practice
experience."  D25-2, P331.  When he was first hired, Kyzer spent more time on the
technical aspect of the TSR position, which gradually changed until February
2011, when his role became mostly sales-oriented.  D25-14, P462.

Between the time that Mazzeo was fired and Kyzer was hired, Boyd made
several trips to Florida to cover Mazzeo's former territory.  D25-2, P327, P336.  At
the time of Kyzer's hire, Boyd had already discussed the possibility of assigning
Kyzer to Florida.  D25-2, P336.  Within a month of his hire, Kyzer accompanied
Boyd to Florida.  D25-2, P329.  The purpose of these trips was to introduce Kyzer
to CRI accounts in Florida because he would be covering those accounts.  D25-14,
P456.  During Kyzer's first two months, Lumpkin trained Kyzer, and thereafter
Kyzer received training from another TSR based in Ohio, and then a product
manager for a period of about a year and a half.  D25-14, P457.  By the summer of
2009, Kyzer was assigned to cover Florida.  D23-1, P126, ¶13.  Approximately
half of the accounts that Kyzer worked on in 2009 were based in Florida.  D25-12,
P404-405.

B.    District Court Opinion

The district court granted summary judgment to CRI on Mazzeo's ADA termination claim on the ground that he had failed to establish a prima facie case, specifically because, in the court's view, Mazzeo had not proved he was disabled or, in the alternative, regarded as disabled. D33, P599. The court concluded that there was "no evidence of record which supports the conclusion that Plaintiff's impairment affected a major life activity." *Id*. at n. 2. The court also found that Mazzeo's doctor's affidavit contained "no detailed discussion as to whether Plaintiff's back condition affected any of Plaintiff's life activities," and that, "standing alone," it was not sufficient to establish that Mazzeo was disabled. D33, P599. In its "regarded as" analysis, the court held that Mazzeo was required to show that his back condition was more than transitory and minor and concluded that his impairment was, "as defined by the relevant statute, transitory" because Mazzeo's post-surgery medical restrictions were expected to last between three and six months. D33, P600-601. The court did not address whether the condition was also minor. *Id*.

The district court also granted summary judgment on Mazzeo's ADEA claim because, in the court's view, he had failed to present sufficient evidence of discriminatory intent — the only element of the prima facie case in contention — in light of facts that Mazzeo had previously indicated when he was first hired that

10

he preferred not to relocate, his failure to apply formally for the position, and that

Kyzer was hired into a TSR position based in Atlanta, Georgia.  D33, P603-604.

Though the parties disputed which prima facie case formulation applied — the

standard prima facie test or a modified RIF version — the court applied the

modified RIF test to hold that Mazzeo's failure to apply formally for the vacant

TSR position precluded him from establishing a prima facie case.  D33, P601-603.


## ARGUMENT

Applying a *de novo* standard of review, this Court should reverse the district

court's grant of summary judgment.  The district court erred in holding that

Mazzeo failed to establish he was disabled despite offering sufficient evidence of

coverage on three separate bases — a physical impairment that substantially limits

the major life activity of lifting, a physical impairment that substantially limits

neurological function, and that CRI regarded him as disabled.  The district court

also erred in concluding that there was insufficient evidence of discriminatory

intent relating to Mazzeo's termination as to both ADA and ADEA claims.


I.    Mazzeo is disabled within the meaning of the amended ADA.

The general purpose of the ADAAA is to correct the "overly restrictive

interpretation of the statute's terms" that had been applied prior to the amendments.

*Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 858 (11th Cir. 2010) (internal

citation omitted).  Accordingly, the amendments make the central focus of a prima

facie analysis for disability discrimination whether the employer complied with the

law, not whether the plaintiff is disabled.  Pub. L. No. 110-325, §2(b)(5) ("[I]t is

the intent of Congress that the primary object of attention in cases brought under

the ADA should be whether entities . . . complied with their obligations," and that

a determination of disability "should not demand extensive analysis.").  The

amendments state that "[t]he definition of disability in this Act shall be construed

in favor of broad coverage . . . to the maximum extent permitted by the terms of

this Act."  *Id*. at §4(a)(4)(A).


A. Mazzeo presented sufficient evidence to show he has a physical
impairment that substantially limits the major life activity of lifting.

To establish a prima facie case under the ADA, a plaintiff must show: "(1) a

disability, (2) that she was otherwise qualified to perform the job, and (3) that she

was discriminated against based upon the disability." *Cleveland v. Home Shopping

Network*, 369 F.3d 1189, 1193 (11th Cir 2004).[3]

---

[3] CRI argued that Mazzeo was not a "qualified individual with a disability"
because he was not disabled, but did "not dispute that he was qualified for his
position as a TSR."  D23, P114-15.

The amended ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Major life activities enumerated in the statute include sleeping, walking, standing, lifting, and bending. *Id*. at § 12102(2)(A). The definition of a major life activity also includes the operation of major bodily functions such as neurological function. *Id*. at § 12102(2)(B). Mazzeo's testimony and his doctor's affidavit clearly identified a physical impairment — a herniated disc — and reflected that his condition affected at least one major life activity explicitly covered by the ADA, lifting.[4] 42 U.S.C. § 12102(2)(A). CRI did not dispute either point. D23, P111-12. The contested issue under this prong of the disability analysis turns on whether Mazzeo's condition was "substantially limiting."

The statute makes clear that the term "substantially limiting" is to "be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008," which are to "reinstat[e] a broad scope of protection." 42 U.S.C. § 12102(4)(B) and Pub. L. No. 110-325, § 2(b)(1). The question of whether a condition is substantially limiting involves an "individualized assessment" that

---

[4] While Mazzeo testified that other life activities such as bending, standing, having sex, and golfing were affected by his impairment, the court need only determine that Mazzeo's condition affected one major life activity. *See* 42 U.S.C. § 12102(1)(A).

compares the individual's ability to perform a major life activity in comparison to "most people in the general population."  29 CFR § 1630.2(j)(1)(ii) and §1630.2 (j)(1)(iv).  That comparison may involve, but does not require, a scientific or medical analysis.  *Id*. at § 1630.2(j)(1)(v).  Relevant to the comparison are considerations of "the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function.  In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity."  *Id*. at § 1630.2(j)(4)(ii).[5]

---

[5] This Court has regularly consulted and followed the Commission's regulations on the ADA when interpreting the term "substantially limits."  *See, e.g.*, *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 n.4 (11th Cir. 2004) (stating that "this Court also frequently looks to the EEOC regulations for interpretive guidance regarding Subsection A of the ADA," and consulting the Commission's regulations in its interpretation and application of the term "substantially limits") (internal citations omitted); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226-1227 (11th Cir. 1999) (consulting the Commission's regulations on the ADA to interpret the term "substantially limits," stating that "[c]ourts, including the Eleventh Circuit Court of Appeals (Eleventh Circuit), frequently look to EEOC regulations to assess the next analytical step of determining whether a physical impairment substantially limits a major life activity") (internal citation omitted); *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911-12 (11th Cir. 1996) (citing and applying the EEOC's regulations to determine whether an impairment is substantially limiting).

Mazzeo presented more than sufficient evidence upon which a factfinder could reasonably conclude that his herniated disc substantially limited him in the major life activity of lifting. An affidavit from Mazzeo's doctor reflected that his back condition affected his ability to lift objects over 10 pounds on a likely permanent basis. Mazzeo also testified that he was placed under additional lifting restrictions for approximately three to five months following his surgery, that he had experienced back pain for years, and continued to do so through the time of his deposition. His doctor's affidavit also states that Mazzeo was prescribed a back brace "to assist him in the activities of daily living." D25-16, P488, ¶10.

Most people in the general population are not limited in their ability to lift items weighing over 10 pounds, do not use a back brace, nor experience back pain of the severity that requires prescription medication, injection treatment, and eventual surgery. In addition, evidence of a lifting restriction is precisely the kind of medical restriction that the Commission's regulations identify as evidence of substantial limitation in the major life activity of lifting. 29 CFR § 1630.2(j)(1)(viii) ("[S]omeone with an impairment resulting in a 20-pound lifting restriction that lasts or is expected to last for several months is substantially limited in the major life activity of lifting, and need not also show that he is unable to perform activities of daily living that require lifting in order to be considered substantially limited in lifting."). Moreover, without the mitigating measure of a

15

back brace, Mazzeo would not have been able to lift certain objects even after

recovering from surgery.  In that the amended ADA requires evaluation of

limitations without regard to mitigating measures (42 U.S.C. § 12102(4)(E)(i)(I-

IV)), a factfinder could reasonably conclude that Mazzeo's limitations were

permanent.  The district court, however, neither engaged in a comparative

assessment of Mazzeo's condition nor considered his impairment without the use

of mitigating measures.  D33, P598-99.

Mazzeo also testified that his back condition affected his ability to engage in

certain physical activity when it "flare[d] up."[6]  Though Mazzeo was not

substantially limited in lifting every day, the amended ADA clarifies that the

relevant inquiry is whether the condition — *when active* — substantially limits the

major lift activity.  42 U.S.C. § 12102(4)(D).  Thus, episodic impairments can

constitute a disability.  *Id.*  This Court's analysis in *Carmona* — under the more

stringent and now superseded pre-ADAAA standard — strongly counsels in favor

of holding that Mazzeo established that he was substantially limited in the major

life activity of lifting and therefore disabled under the significantly more expansive

amended ADA that applies to this case.  In *Carmona*, this Court held that the

plaintiff established he was disabled because, though "intermittent," his medical

---

[6]  Though Mazzeo did not testify specifically about how his "flare ups" affected his
ability to lift, his testimony would allow a factfinder to reasonably infer that it was
during these flare-ups that his ability to lift was impacted as well.

condition substantially affected a major life activity when the condition "flare[d]-up."  604 F.3d at 858-859 (noting the frequency and recurring nature of the flare-ups, the plaintiff's testimony regarding his condition, and his physician's opinion that the condition impaired his ability to walk).  This Court did not retroactively apply the ADAAA in *Carmona*, but nonetheless observed the effect that the amendments would have on "episodic" conditions — namely, that "[t]hese amendments . . . make it easier for a plaintiff with an episodic condition . . . to establish that he is an 'individual with a disability.'"  *Id*. at 855.  Here, Mazzeo's episodic pain, as demonstrated by his testimony describing the pain and continuous flare-ups, his doctor's affidavit, and evidence relating to his medical treatment — epidural injections, surgery, lifting restrictions and back brace — are sufficient to allow a finding that his condition substantially limited him in the major life activity of lifting.


> B.  Mazzeo presented sufficient evidence to show he has a physical impairment that substantially limits his neurological function.

Another innovation within the amended ADA is its inclusion of various major bodily functions that now constitute major life activities.  42 U.S.C § 12102(2)(B).  Thus, a plaintiff can establish a disability with evidence that a physical impairment substantially limits a major bodily function.  *Id*.  Impairments affecting a major bodily function, "[g]iven their inherent nature," will "virtually

always be found to impose a substantial limitation," making the assessment

"particularly simple and straightforward." 29 CFR § 1630.2(j)(3)(ii). *See also, id.*

at § 1630.2(j)(3)(iii) (discussing examples). The district court did not address this

aspect of Mazzeo's argument and CRI did not address it in its motion for summary

judgment. D33, P598-99; D23, P111-12; D33, P599-600.

Mazzeo's doctor's affidavit identified his back condition as "degenerative

disc disease, including a herniated disc at the L4-5 level of the lumbar spine" and

"a moderate to large sized central disc herniation, which includes nerve root

involvement, specifically the L5 nerve roots bilaterally." D25-16, PP487, ¶¶4-5.

The definition of the term 'neurological' is that which relates to "the nervous

system," particularly to its "structure, functions, and abnormalities." Merriam-

Webster Online, http://www.merriam-webster.com/dictionary/neurology (last

visited March 12, 2012). The "nervous system," in turn, is defined as "the bodily

system that in vertebrates is made up of the brain and spinal cord, nerves, ganglia,

and parts of the receptor organs and that receives and interprets stimuli and

transmits impulses to the effector organs." *Id*. at http://www.merriam-

webster.com/dictionary/nervous%20system (last visited March 12, 2012).

Neurological function, then, would reasonably include bodily functions related to

the spine and nervous system. Given the purpose of the ADAAA to provide broad

coverage, evidence of Mazzeo's diagnosis of a "herniated disc at the L4-5 level of

the lumbar spine" involving "nerve roots" and "nerve root involvement" along
with evidence that he received epidural injections into his spine, and the treatment
he received from the Laser Spine Institute, is sufficient to show that his physical
impairment substantially limited his neurological function, and that Mazzeo is
disabled on that statutory basis.

### C. Mazzeo's back impairment was not transitory, as demonstrated by the same record evidence of Mazzeo's actual, physical impairment.

Under the amended ADA, an individual can also satisfy the "disabled"
element of the prima facie case by establishing that he was subject to a prohibited
action[7] "because of an actual or perceived physical or mental impairment,"
regardless of whether "the impairment limits or is perceived to limit a major life
activity."  42 U.S.C. § 12102(3)(A).  The ADAAA significantly altered the
"regarded as" analysis by making its primary focus the causation element — that
the employer acted in response to an actual impairment or an assumption that the
employee was impaired — and dispensing altogether with the need to inquire into
the employer's subjective beliefs.  29 C.F.R. Pt. 1630, App. § 1630.2(l) ("This
provision is designed to restore Congress's intent to allow individuals to establish
coverage under the 'regarded as' prong by showing that they were treated
adversely because of an impairment, without having to establish the covered

_____

[7] Termination is a "prohibited action" under the ADA.  29 CFR § 1630.2(l)(1).

entity's beliefs concerning the severity of the impairment") (internal citation omitted).  As a defense, however, the employer may argue – and has the burden of proof to show — that the employee is not covered under the "regarded as" prong because the impairment is both "transitory and minor."  42 U.S.C. § 12102(3)(B); 29 CFR § 1630.15(f).

Though the statute defines "transitory" as a condition having "an actual or expected duration of 6 months or less," it does not define the meaning of the term "minor."  42 U.S.C. § 12102(3)(B).  The legislative history of the ADAAA, however, provides insight into how the phrase is to be understood.  29 C.F.R. Pt. 1630, App. § 1630.2(l) at ¶9 (stating that the Report explained that the purpose of the exception was to eliminate "common ailments like the cold or flu" from coverage and that accordingly, "this limitation on coverage should be construed narrowly" as an exception to "the general rule for broad coverage under the 'regarded as' prong"; the Committee Report further explained that this exception was intended to address the business community's concern over the coverage of "individuals with minor ailments that last only a short period of time" (quoting 2008 House Judiciary Committee Report at 18)).

The district court erred in concluding that Mazzeo's condition was transitory, relying on pre-ADAAA cases applying standards that are no longer applicable.  The record evidence — the same evidence supporting a finding that

Mazzeo's actual back impairment is substantially limiting — is sufficient to show that Mazzeo's impairment is neither transitory nor minor. *See supra* pp. 14-18. Mazzeo's testimony that he experienced years of pain from his back impairment — and that he would likely need to undergo additional surgery in the future — alone makes his condition plainly distinguishable from the kind of illnesses that Congress envisioned should be excluded from "regarded as" coverage, such as the common cold.

Even if this Court were to consider the condition transitory, the district court sidestepped analysis of the term "minor" altogether despite the statute's plain language excepting from coverage only those impairments that are both "transitory *and* minor." Again, the record evidence showing extensive and prolonged medical treatment for Mazzeo's condition over a period of years is sufficient evidence to show that Mazzeo's condition was not minor. It is CRI's burden to show otherwise, but CRI did not argue that Mazzeo's condition was "transitory and minor" in its motion for summary judgment. D23, P111-14.

II.    <u>The district court erred in holding that Mazzeo's failure to formally apply for the vacancy precluded him from establishing a prima facie case of age discrimination.</u>

Assuming that this Court's RIF formulation applies to Mazzeo's ADEA

claim,[8] Mazzeo presented sufficient evidence to establish a prima facie case and survive summary judgment.  The district court was correct in observing that this Court, when applying the RIF test, generally requires that the plaintiff show he applied for a job.  *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344-45 (11th Cir. 2003).  The purpose behind the application requirement, however, is "to eliminate another obvious nondiscriminatory reason: that the plaintiff was not offered the job because the company did not know he was interested."  *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir. 1984).  Therefore, a plaintiff can make out a prima facie case "as long as he establishes that the company had some reason or duty to consider him for the post."  *Id*. at 1133-34 (internal citation omitted).  In addition, the *Carmichael* Court noted that when an employer uses informal, "word of mouth" methods to make a selection, "it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest."  *Id*. at 1133.

---

[8] The Commission notes that the facts do not conclusively establish that the RIF formulation of the prima facie test should have been applied in this case.  The fact that Mazzeo was one of only two TSRs fired nationwide around this time and that Kyzer was hired the same month for the same TSR position that Mazzeo was terminated from raises issue as to whether his termination was actually part of a reduction in force as contemplated by this Court.  *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1316 (11th Cir. 1998) ("Watkins and Mallory rightfully point out that conventionally, a RIF results in "a *shrinking* of the work force") (internal citation omitted) (emphasis in original).

In *Jameson v. Arrow Co.*, 75 F.3d 1528 (11th Cir. 1996), this Court reversed the district court's holding that the ADEA plaintiff had failed to establish a prima facie case, where the plaintiff had not formally applied for a position, but "specifically expressed to a supervisor her interest in the position of personnel administrator — later filled by a younger woman — but was informed that [the company] did not plan to fill this position." *Id*. at 1532-33.  This Court in *Jameson* also held that the company's failure to hire the plaintiff for a vacant position for which she was qualified, and its hire of a younger employee instead, was indicative of discriminatory intent.  *Id*. at 1533 ("An employer's decision to transfer or to hire a younger employee for that available position is sufficient evidence to support an inference of discrimination for the limited purpose of establishing the plaintiff's *prima facie* case.").

Mazzeo, like the plaintiff in *Jameson*, told his direct supervisor of his interest in a specific position — that he wanted to combine his territory with Lumpkin's geographic territory.  In turn, Boyd rejected the idea and told Mazzeo that his responsibilities in Florida were too demanding.  A factfinder could reasonably conclude that Boyd dissuaded Mazzeo from formally applying by communicating that he would not be considered for the role.  The evidence also raises at least a genuine issue of material fact as to whether CRI adhered to its own hiring procedures when hiring Kyzer.  Boyd only became aware of Kyzer's interest

in the position through a professor he knew, interviewed Kyzer without first

receiving an application, and could not recall whether Kyzer had submitted an

application before Boyd made the verbal offer to Kyzer.  It would be an

incongruent application of this Court's RIF case law on this point to hold Mazzeo

to the standard of a formal application when neither the company nor Kyzer

appeared to adhere to those requirements in this case.


III.    <u>Mazzeo presented evidence of discriminatory intent sufficient to establish
a prima facie case and show pretext as to both his ADA and ADEA
claims.</u>

Mazzeo presented sufficient evidence of discriminatory intent and pretext to

both rebut each of CRI's proffered reasons for denying him the consolidated TSR

position and firing him, and to create a triable issue as to whether CRI took these

adverse actions on a discriminatory basis.  Although CRI presented its non-

discriminatory reasons for its actions in the context of Mazzeo's ADEA, not his

ADA, claim (D23, P117-120), the *McDonnell Douglas* [*Corp. v. Green,* 411 U.S.

792 (1973)] burden-shifting framework is applicable to both ADA and ADEA

claims.[9]  Thus, the same evidence used to show discriminatory intent at the prima

---

[9] *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th
Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment
discrimination actions is equally applicable to ADA claims.") (internal citation
omitted); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (stating
that this Court applies the *McDonnell Douglas* framework "to evaluate ADEA

facie stage and additionally show pretext as to the ADEA claim applies equally in support of Mazzeo's ADA claim.

Evidence of increasing sales revenue during the year immediately preceding Mazzeo's termination, the fact that Kyzer was hired in spite of the company's stated economic downturn and specifically into a TSR position, and Kyzer's continued and active servicing of Mazzeo's former territory and clients are sufficient to "cast doubt" on CRI's proffered non-discriminatory reason that it fired Mazzeo because Florida was a poorly performing region.

First, CRI argued that Mazzeo was the only TSR fired in the Southern Region because Florida had experienced "a decline" in sales revenue, had "limited sales potential," and lacked a "need for regular visits from a TSR."  D23, P117. The sales data, however, do not establish that Florida was experiencing a decline. The data show that in 2008 – the year the company asserted it had experienced an economic downturn – sales revenue for Florida increased.  Mazzeo submitted sales data which showed that this upward trend continued into 2009, and that Florida outperformed other territories under Boyd's supervision.  Moreover, evidence that Kyzer — within a month of his hire — took a trip with Boyd to Mazzeo's former region of Florida to be introduced to CRI clients is sufficient for a reasonable jury to question whether the company's assertion that the area lacked a need for regular

---

claims that are based upon circumstantial evidence of discrimination").

25

visits from a TSR was actually true.  In fact, approximately half of the accounts
Kyzer worked on in 2009 were based in Florida.  In addition, during the interim
between Mazzeo's termination and Kyzer's hiring, Boyd himself traveled to
Florida to cover that territory.  Boyd's testimony providing competing and
disconnected reasons to explain why CRI never considered Mazzeo for either the
TSR position vacated by Lumpkin or a consolidated position also suggests pretext.

Secondly, CRI argued that the TSR position for which it hired Kyzer was
not the same as Mazzeo's TSR position because Kyzer's TSR position required
more sales skills.  D23, P120.  Under similar circumstances where employers have
offered post-hoc explanations amplifying particular skills of a position to explain a
refusal to hire a covered employee, this Court has found sufficient evidence of
discriminatory intent to satisfy a prima facie case and preclude summary judgment
altogether.  *See Benson v. Tocco, Inc.*, 113 F.3d 1203, 1206-07, 1211-12 (11th Cir.
1997) (holding that the "ultimate question of whether [defendant] was motivated
by discriminatory animus in terminating Benson during the RIF is a question that
must be presented to the jury," where the named plaintiff presented evidence that
the company advertised for a similar position to his own several months before his
termination and ultimately hired an individual for that role who lacked experience
in the area that the company had argued he was deficient in).  *See also*, *Durley v.
APAC, Inc*., 236 F.3d 651, 656-57 (11th Cir. 2000) (in a Title VII denial of

26

promotion analysis, holding that the plaintiff had raised a "question of fact for the jury" regarding discriminatory intent where the employer had consolidated two positions and rejected her for that position based on a job description that emphasized the qualifications of the male employee selected over her, and where deposition testimony showed that the promoted employee "had no formal administrative or purchasing experience" in contrast to plaintiff's qualifications and her previous experience related to the position at issue).

The record evidence establishes that CRI had a TSR vacancy and sought to hire for that position more than several months before Mazzeo's termination. Mazzeo had expressed interest in the consolidation of that position with his current TSR position, suggesting that the geographic range of the two positions be covered by one person — himself. That is precisely the consolidation that occurred soon after Mazzeo was fired and the position was given to Kyzer. When Mazzeo suggested the idea of consolidation in late January or early February 2009, Boyd rejected it. By that time, Boyd was aware of Mazzeo's back condition, as Mazzeo's first conversation with Boyd about his back condition occurred in January 2009. CRI's post-hoc rationale that Mazzeo lacked the sales skills required of the newly envisioned TSR position suggests pretext, given that Mazzeo had more sales experience than Kyzer (who had none), was a well rated employee, had a record of bringing on new clients, and in light of CRI's failure to determine

27

whether Mazzeo in fact had the sales skills necessary for the restructured TSR

position.  *See Benson*, 113 F.3d at 1212 (stating that, in addition to other facts, the

"[defendant]'s apparent failure to investigate the possibility that Benson might

have had the necessary skills to adapt to a restructured human resources position,

gives rise to an inference of discrimination").  *Cf. Watkins v. Sverdrup Technology,*

*Inc.*, 153 F.3d 1308, 1313 (11th Cir. 1998) (finding that ADEA plaintiffs who were

fired and the younger employees who were hired during the RIF were not similarly

situated because the younger employees were skilled in entire areas of expertise

that the plaintiffs were not — namely aircraft integration, systems integration, and

product manufacturing).

Finally, CRI argues (but offers no persuasive authority in support of its

argument) that pretext as to Mazzeo's age claim cannot be shown where the

decisionmaker is also within the protected age group and other employees within

the protected age group were not fired.  D23, P120.  No such showing is required

in a discrimination case.  *E.g.*, *Combs v. Plantation Patterns,* 106 F.3d at 1527-

1530, 1537-38 (11th Cir. 1997) (setting forth the elements of proving

discrimination and the principles which should guide courts' analyses).  Indeed,

"emphatically" rejecting the very rationale advanced by CRI, the Seventh Circuit

has observed that "the relative ages of the terminating and terminated employee are

relatively unimportant," as older people may "exempt themselves from what they

28

believe to be the characteristic decline of energy and ability with age," "want to

surround themselves with younger people," "protect their own jobs by making sure

the workforce is not too old," and "be oblivious to the prejudices they hold."

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001).   *See also*,

*Williams v. General Motors Corp.*, 656 F.2d 120, 128 (5th Cir. 1981)

("Discrimination exists, to be sure, 'in forms as myriad as the creative perverseness

of human beings can provide.'" (quoting *McCorstin v. United States Steel Corp.*,

621 F.2d 749, 753-54 (5th Cir. 1980)).

    With respect to Mazzeo's ADA claim, additional evidence of discriminatory

intent and pretext preclude summary judgment.  The close temporal proximity

between Mazzeo's disclosure of his back condition and his termination is also

evidence upon which a factfinder could reasonably conclude that he was

discriminated against on the basis of his disability.

    This Court defines the "because of" element of the prima facie case of

disability discrimination as causation language requiring a showing that the

plaintiff's disability was "'a factor that made a difference in the outcome.'"  *Farley*

*v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999) (noting that

the term "motivating factor" is also "synonymous" with this Court's standard that

"'simply require[s] that a disability be shown to be a determinative, rather than the

sole, decision-making factor'" (quoting *McNely v. Ocala Star-Banner Corp.,* 99

F.3d 1068, 1077 (11th Cir. 1996)).

The record reflects that Mazzeo disclosed his need for back surgery in January 2009 and thereafter had multiple conversations with Boyd about his surgery.  In these conversations, Mazzeo did not limit his discussion of surgery to technical details of the date and time of the procedure, but also discussed his back problems with Boyd.  The details which Mazzeo provided to Boyd conveyed the serious nature of his back condition generally, including his explanation to Boyd that his doctors had to delay the surgery because his MRI test results indicated more tests were necessary, the need for the surgery itself, as well as the special medical restrictions that would follow his surgery.  On February 26, 2009, the day after Mazzeo told Boyd he was scheduled for surgery on March 11th, Boyd initiated the paperwork for Mazzeo's termination.  Boyd fired Mazzeo on March 10th, immediately preceding his surgery and approximately two weeks after Mazzeo told him the date of his surgery.

This time frame is within the range that this Court has found sufficient for showing a causal connection between protected conduct and an adverse action to establish a prima facie case of retaliation.  *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297-98 (11th Cir. 2006) (holding that a temporal proximity of two weeks is not only sufficient to establish a prima facie case, but also indicative of pretext); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-601

30

(11th Cir. 1986) (four weeks sufficient to prove causation).

Though these analyses arise out of the retaliation context, this Court's rationale in these cases is applicable here, as an employee's disclosure to an employer of his disability is analogous to an employee's engagement in protected activity that then triggers an adverse employment action. Where nothing in the employment relationship has changed except the revelation of a disability, the close temporal proximity of the adverse action to the revelation supports the inference that the revelation caused the action. Here, the evidence reflects that soon after Mazzeo's initial disclosure, which was then followed by multiple conversations concerning his surgery and the severity of his back condition, Boyd counseled Mazzeo to consider whether he would be able to return to work quickly given the physical demands of the job, and then fired him. In light of this Court's causation analyses in the retaliation context, the temporal proximity between Mazzeo's disclosure and his termination is indicative of discriminatory intent at least sufficient to establish a prima facie case.

CONCLUSION

The factual record, the purpose and plain language of the ADAAA, and this Court's precedent support reversal of the district court's holding that Mazzeo failed to present sufficient evidence from which a jury could reasonably conclude that he

31

was disabled under the amended ADA, as the district court applied an overly

narrow interpretation of the term "substantially limiting," failed to accurately

analyze whether the impairment was both "transitory *and* minor," and ignored an

analysis of major bodily function altogether.  This Court should also reverse the

district court's holding that Mazzeo was required to submit a formal application to

show he "applied" for a vacancy, even after he told Boyd of his interest in a

specific position and Boyd conveyed that Mazzeo should not apply.  Finally,

inconsistent with this Court's precedent finding similar evidence sufficient for

establishing discriminatory intent and pretext, the district court's holding that

Mazzeo failed to create a triable issue on the matter of discriminatory intent should

accordingly be reversed.


Respectfully submitted,

P. DAVID LOPEZ
General Counsel

LORRAINE C. DAVIS
Acting Associate General Counsel

CAROLYN L. WHEELER
Assistant General Counsel


___/s Christine Back_____
Christine J. Back
Attorney

32

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M Street, N.E.
Room 5NW14P
Washington, D.C.  20507
(202) 663-4734 (phone)
(202) 663-7090 (fax)
christine.back@eeoc.gov

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume requirements set forth in Federal Rules of Appellate Procedure Rule 32(a)(7)(B).  This brief contains 6,962 words, from the Statement of Interest through the Conclusion, as determined by the Microsoft Word 2003 word processing program, with 14-point proportionally spaced type for text and 14-point proportionally spaced type for footnotes.


    /s Christine Back

CHRISTINE BACK
Attorney
EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. NE, 5th Fl.
Washington, D.C.  20507
(202) 663-4734
christine.back@eeoc.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that one original and six copies of the foregoing brief were

sent this 12th day of March, 2012, by FedEx Next Day Air, postage prepaid, to the

Clerk of this Court.  I further certify that one copy of the foregoing brief was sent

this same day, by FedEx Next Day Air, postage prepaid, to the following counsel

of record for Plaintiff-Appellant and Defendant-Appellee, respectively:


<u>Counsel for Plaintiff-Appellant</u>
David B. Sacks
Law Office of David B. Sacks, PA
1017 Lasalle Street
Jacksonville, Florida 32207
david@sackslegal.com
(904) 634-1122

<u>Counsel for Defendant-Appellee</u>
Chelsie J. Flynn
Ford & Harrison, LLP
300 S. Orange Ave., Suite 1300
Orlando, FL 32801
(407) 418-2300

       /s Christine Back

CHRISTINE BACK
Attorney
EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. NE, 5th Fl.
Washington, D.C.  20507
(202) 663-4734
christine.back@eeoc.gov

35